Rodríguez García, Juez Ponente
*999 TEXTO COMPLETO DE LA SENTENCIA
Mediante dos recursos de apelación, acuden ante nosotros las partes demandadas en un complejo, novel y extenso caso de daños y perjuicios por síndrome de edificio enfermo. Los apelantes-demandados nos solicitan que revoquemos la sentencia que los declaró responsables por los daños ocasionados a sesenta y siete (67) empleados públicos y sus familiares a causa del síndrome de edificio enfermo, condenándolos a pagar solidariamente una suma total de $2,001,000.00 en indemnización. Por resolver que a causas imputables a culpa y negligencia ocurrió el suceso de síndrome de edificio enfermo y que los demandantes sufrieron daños a causa del mismo, confirmamos la sentencia apelada.
*1000 I-Hechos
Isacaar, Inc. (en adelante Isaacar) es una corporación doméstica que originalmente se dedicó al negocio de comestibles bajo el nombre de Supermercados Plaza Gigante. El Presidente de Isacaar, Inc. es Lucas Malavé Rivera (en adelante Malavé Rivera).
Isaacar es la dueña de un edificio (en adelante Edificio Isaacar) de aproximadamente 60,000 pies cuadrados que está localizado en la Carretera Núm. 3 esquina Avenida Boulevard salida hacia Naguabo en el Municipio de Humacao. El edificio está construido en acero, con bloques de cemento laterales y techo en zinc. Al edificio se le añadió un segundo piso de 15,000 pies cuadrados. Originalmente, el Edificio Isaacar estuvo ocupado en su totalidad por el Supermercado Plaza Gigante, el cual era operado por Isaacar.
Luego, el Supermercado Plaza Gigante redujo sus operaciones y se limitó a utilizar un área de 45,000 en el primer piso del edificio. En diciembre de 1987, las operaciones del Supermercado Plaza Gigante fueron vendidas al supermercado Tremendo Cash & Carry (en adelante Supermercado Tremendo). De esa forma, el Supermercado Tremendo se limitó a ocupar un área de 45,000 pies cuadrados en el primer piso del Edificio Isaacar.
Para principios de 1988, la oficina local de Humacao de la Administración de Derecho al Trabajo (en adelante ADT) estaba localizada en un pequeño e incómodo local. Por tales motivos, se le autorizó al entonces director regional de ADT, Sr. Cruz Merced Vázquez (en adelante Merced Vázquez) a buscar otro edificio a donde mudar las facilidades de ADT. Merced Vázquez recibió varias ofertas, entre ellas, una oferta de Malavé Rivera, Presidente de Isacaar. Merced Vázquez visitó las facilidades del Edificio Isaacar. Como él observó que en el edificio existía el espacio para instalar las oficinas de ADT y había suficientes espacios de estacionamientos para los empleados y los visitantes, comenzaron las conversaciones para el arrendamiento de un local de 15,000 pies cuadrados en dos niveles.
ADT preparó un diseño del local para 83 empleados, según sus necesidades. Isaacar construyó las facilidades en la mitad del espacio vacío de 15,000 pies cuadrados del Edificio Isaacar y habilitó el local de conformidad a las especificaciones acordadas y suplidas por ADT. El local a ser arrendado estuvo disponible para junio de 1988.
El local de ADT tenía un espacio de 15,000 pies cuadrados y estaba dividido en dos niveles. Cada nivel del local de ADT medía alrededor de 7,5000 pies cuadrados. El local colindaba por dos lados con el Supermercado Tremendo y por otro lado colindaba en ambos niveles con un local vacío que a su vez tenía dos niveles. Las paredes que separaban el local de ADT del local vacío y del Supermercado Tremendo, así como sus divisiones internas, estaban hechas de “gypsum board’’.
El 27 de mayo de 1988, Isacaar y la ADT firmaron el contrato de arrendamiento del local en el Edificio Isaacar para la instalación de las oficinas regionales de ADT en Humacao. El contrato de arrendamiento era por un término de cinco (5) años, comenzando el 1ro de junio de 1988 y terminando el 1ro de junio dce 1993. El canon mensual a ser pagado por ADT por el arrendamiento del local era de $10,625.00. ADT se mudó al Edificio Isaacar el 1ro de junio de 1988.
Durante los meses de agosto a septiembre de 1988 algunos de los empleados en el local de ADT comenzaron a quejarse de tener problemas en respirar, enrojecimiento de la piel y picazón en el cuello y los brazos. Para finales de 1988, alrededor de veinte (20) empleados de un total de ochenta y tres (83) empleados que trabajaban en el local de ADT del Edificio Isaacar se quejaban de padecer algún síntoma relacionado al síndrome de edificio enfermo.
*1001 El 19 de septiembre de 1989 pasó el Huracán Hugo por Puerto Rico. El viernes antes de pasar el Huracán Hugo, Merced Vázquez llamó por teléfono a Malavé para preguntarle qué medidas iba a tomar para proteger el edificio del huracán. Malavé le contestó que no se haría nada. Que no haría nada para proteger el edificio. Testimonio de Merced Vázquez, Vol. 1, págs. 41-43 y 150-152. Cuando pasó el Huracán Hugo entró agua al local vació por ambos pisos del local, debido a que había unas ventanas abiertas.
En la madrugada del lunes 19 de septiembre de 1988, después de haber pasado el Huracán Hugo, Merced Vázquez, acompañado con sus tres hijos, entró al local de ADT para ver si había sufrido daños. Ellos encontraron que el centro del primer piso del local estaba inundado con alrededor de media pulgada de agua y procedió con la ayuda de sus tres (3) hijos a sacar el agua del local. Al próximo día por la mañana volvió a encontrar el centro del primer piso inundado. El piso fue secado por Merced Vázquez y el conserje.
El próximo día, cuando Merced Vázquez regresó al local de ADT encontró a varios empleados secando el primer piso del local. Un conserje de la oficina de ADT, buscando el origen del agua que inundaba el primer piso del local, entró al local vacío y encontró una gran cantidad de agua acumulada en una zanja que se hizo para instalar la tubería sanitaria del local de ADT. Los empleados de ADT sacaron el agua acumulada en la zanja del local vacío y el local de ADT dejó de inundarse.
Durante octubre de 1989, comenzaron a surgir manchas color marrón oscuro en las oficinas de empleados y en la pared de “gypsum board” del primer piso que colinda con el local vacío. Al principio, los conserjes del local de ADT las limpiaron, pero las mismas volvieron a salir días más tarde. Luego, los conserjes limpiaron las manchas y pintaron las paredes. Sin embargo, las manchas volvieron a salir en la misma pared y en otras paredes del primer piso. Como las manchas en las paredes continuaban, para noviembre de 1989, la ADT se comunicó al Departamento de Salud. En diciembre de 1989, el Departamento de Salud envió un funcionario que examinó las oficinas de ADT y estaba supuesto a rendir un informe a la Secretaría Auxiliar del Seguridad y Salud en el Trabajo del Departamento del Trabajo y Recursos Humanos (OSHO). El funcionario del Dept, de Salud nunca rindió informe alguno a OSHO. Durante los meses de diciembre a enero de 1990, funcionarios de ADT hicieron varias llamadas a OSHO. Mientras tanto, las quejas de los empleados de que había algo en el ambiente que les molestaba iban en aumento.
El 2 de marzo de 1990, se tomaron muestras de las manchas en las paredes y se enviaron al Laboratorio Clínico Caparra. Exh. 6 del Dte. El 5 de marzo de 1990, Merced Vázquez envió a Malavé una carta en la que le informó por primera vez que en las oficinas de ADT en Humacao hay “un problema de Hongos en el piso, paredes y aires acondicionados en el primer piso que está causando enfermedades entre los empleados.” Exh. 4 del Dte.
Durante los meses de febrero a marzo, la oficina de ADT en Humacao continuó llamando a OSHO, pero no fueron atendidos. Ante esta situación, empleados de la oficina llamaron a las noticias del canal 4 y estos hicieron un reportaje por la televisión. Después del reportaje por televisión, el 21 de marzo de 1990, fue a las oficinas una funcionaría de OSHO llamada Myrna Maldonado (en adelante Maldonado). Maldonado visitó los lugares afectados con manchas en las oficinas y explicó que ella entendía que los problemas del ambiente podían provenir del “fiberglass” del aire acondicionado. Que ella entendía que las manchas en las paredes no era algo que estuviera afectando a los empleados; sin embargo, ella iba a regresar otro día para verificar qué eran las manchas en las paredes.
El 23 de marzo de 1990, visitó las Oficinas de ADT la funcionaría de OSHO Yazmini Rodríguez Vázquez (en adelante Rodríguez Vázquez) quien continuó el trámite de las querellas. Rodríguez Vázquez se reunió con Merced Vázquez y otras personas y examinó las oficinas de ADT. Del informe de Rodríguez Vázquez se desprende las siguientes observaciones:

*1002
“a) Existencia de hongos en las paredes y pisos- pude observar la presencia de los mismo[sj. Que[d]é en hacer un muestreo para hongos y bacterias. Tomé fotos.

b)...

C) El techo del segundo piso es de zinc y el área del Coordinador Regional, Adiestramiento en Empleo y Adiestramiento Técnico, no tiene insulación el sistema. Se tomará lectura de temperatura.

d)...

e) Empleados con mucho picor en el cuerpo, de los conductos de aire acondicionado están saliendo fibras de cristal- se le indicó que se haría muestreo de ocho (8) hrs. y otro con “wipe”. Exh. 5 del Dte. Expediente de OSHO de las querellas 73166456 y 73165359.
Desde el 23 de marzo al 18 de abril de 1990, Rodríguez Vázquez realizó varias visitas a las Oficinas de ADT en el Edificio Isaacar. Tomó muestras para laboratorio y notas de la situación existente en las oficinas. Según el expediente de OSHO, para el 27 de marzo de 1990 setenta (70) de los ciento tres (103) empleados que trabajaban en la oficina regional de ADT en Humacao estaban reportados al Fondo del Seguro del Estado (FSE).
Mientras tanto, Merced Vázquez recibió el resultado de la muestra de hongos de las paredes enviadas al Laboratorio Caparra. Según el informe, se identificó el hongo como Aspergillus Niger. Exh. 6 de Dte. Con fecha de 26 de marzo de 1990, Merced Vázquez envió una carta a Malavé informándole de la visita de Maldonado a las Oficinas de ADT. Que el 20 de marzo de 1990, una empleada llamada Gisela Guzmán tuvo que ser llevada al Hospital Ryder por una reacción alérgica relacionada con los conductos de aire acondicionado y que recibió prueba de la existencia de hongos que son nocivos a la salud en las Oficinas de ADT. Exh. 6 de Dte.
Además, el 26 de marzo de 1990, Merced Vázquez llamó por teléfono a la Administradora de ADT, Ileana Echegoyen (en adelante Echegoyen) y le informó que había recibido un informe de laboratorio que indicaba que las manchas de las paredes era un hongo llamado Aspergillus. Echegoyen ordenó que los empleados fueran sacados de las oficinas y que los servicios de la oficina regional fueran ofrecidos en otros lugares. Ese mismo día, Merced Vázquez ordenó a todos los empleados a salir de las Oficinas de ADT en el Edificio Isaacar.
El 27 de marzo de 1990, Merced Vázquez recibió una carta de Malavé informándole que recibió la carta que él le había enviado el 26 de marzo de 1990. En la carta, Malavé informó que se proponía “contratar en los próximas días los servicios de un consultor a los fines de que visite las facilidades arrendadas a ustedes y me rinda un informe al respecto.” Pág. 2 del Exh. 7 del Dte.
El 4 de abril de 1990, se celebró una reunión a la cual asistieron Malavé, su abogado, Ledo. Roberto Corretjer Piquer, Merced Vazquez, Eligió Ferreit y el Sr. Pizarro, gerente del Supermercado Tremendo. En la misma se acordó un plan de mejoras a ser realizados por Isaacar en las Oficinas de ADT, tales como cambiar las paredes interiores medianeras entre el local vacío y las Oficinas de ADT. Además, entre el Supermercado Tremendo y las Oficinas de ADT, instalar nuevas planchas de “gypsum board” que sean resistentes a la humedad, antihongos y “fire retardable”, limpiar pisos y paredes con clorox, instalar extractores para que salga el aire entre el plafón, instalar rejillas para que fluya el aire y refresque el plafón, poner una capa de uretano en el techo, instalar extractores en todos los baños, etc...
Después del 4 de abril se comenzaron a trabajar en las mejoras acordadas. Se cambiaron todas las paredes interiores (entre el local vacío y ADT, también entre ADT y el Supermercado Tremendo), las paredes se *1003 pintaron con pinturas antihongos, se instalaron las rejillas en el techo y se limpiaron los pisos con Clorox y Lysol.
El 20 de abril de 1990, OSHO dictó una Citación y Notificación de Penalidades de cinco (5) páginas identificando serías violaciones en las oficinas de ADT. En la misma, se informó lo siguiente:

“Los sitios de empleos no se mantenían limpios y/o en orden, o en condiciones sanitarias:

En las siguientes áreas:

a) En el Area de Archivos-el ambiente de trabajo no se mantenía en condiciones sanitarias. El crecimiento de medios selectivos demuestra la presencia de:

1- Hongos - Rhizopus, Aspergillus Niger, Mucos, (en pruebas del ambiente y en el crecimiento de la superficie de la pared).

2- Levaduras - Candida albicans -(en pruebas de ambiente)

3- Bacterias - Serrates marcences, Klebsiella pneumonie, Sarcina lútea, Staphylococcus aureus y Bacillus subtilis. (en prueba del ambiente y en el crecimiento de la superficie de la pared y piso).
b) Area de cuarto de archivos - el ambiente no se mantenía en condiciones sanitarias. El crecimiento de medios selectivos muestra la presencia de:

1 - Hongos: Rhizopus, Aspergillus Niger y Mucor. (en pruebas del crecimiento de la superficie de la pared.)

Riesgo: Los Hongos, Levaduras y Bacterias puede ganar acceso en el cuerpo de los empleados por ingestión, inhalación y contacto con la piel. Y causa pulmonía, accesos asmáticos, infecciones de la piel, infecciones pulmonales con aspergilos, impetigo, infecciones del tracto respiratorio.” Exh. 5 del Dte.
Las violaciones existentes en las Oficinas de ADT debían ser corregidas en o antes del 7 de mayo de 1990. Exh. 5 del Dte.
Por motivo de la Citación y Notificación de Penalidad dictada por OSHO, Merced Vázquez solicitó a ADT a que desinfectaran las Oficinas de ADT en Humacao. Exh. núm. 14 del Dte. Al comienzo, los administradores de ADT se negaban en realizar un proceso de desinfección en las oficinas de ADT en Humacao, pero por el informe de OSHO y la negativa de los empleados de volver a trabajar en las oficinas hasta que fueran desinfectadas, los administradores de la ADT accedieron a la desinfección de las oficinas.
El 17 y 18 de mayo de 1990, las Oficinas de ADT fueron desinfectadas por la Ponce Enviromental Services (en adelante PES). Exh. 18 del Dte. El 21 de mayo de 1990 y el 16 de junio de 1990, la PES rindió informes a Merced Vázquez relacionados al proceso de desinfectación realizado por dicha compañía en las Oficinas de ADT en Humacao.
En el segundo informe que PES rindió a Merced Vázquez se mencionaron los siguientes hallazgos y recomendaciones:

“Durante el proceso de trabajo en las facilidades de ADT en Humacao pudimos constatar lo siguiente:

1 - las máquinas de aire acondicionado que suplen el aire a las oficinas están colocadas dentro del edificio. 
*1004
El aire del interior de las oficinas nunca tiene contacto con aire fresco del exterior, sólo circula y recircula en las oficinas.

2- no pudimos observar conductos de retorno de aire a las máquinas de aire acondicionado.

3- los filtros de aire acondicionado que tienen las máquinas son de baja eficiencia (pobre retención de particulado)

4- el local adyacente a las oficinas de ADTfue objeto de contaminación microbiológica y posiblemente esté contaminado.

5- existen neveras y facilidades del supermercado separadas de las oficinas tan sólo por planchas de madera.

6- observamos crecimiento de hongos en paredes, pisos, techos y difusores de aire acondicionado. 7- pudimos medir una temperatura promedio de 82 C en el segundo piso del edificio y una humedad relativa de 68% Rh.

* * *

El plan de maestreo reveló que los hongos encontrados no son patógenos. Es decir, no producen enfermedades en los seres humanos por sí mismos, sino que aprovechan condiciones de debilidad y depresión del sistema inmunológico del organismo para crear problemas de salud. Por esta razón se les llama hongos oportunistas. Se logró identificar los siguientes hongos:

- Penicillum

- Aspergillus Niger

- Rhizopus

- Mucor

Las bacterias identificadas en el área del piso fueron:

- Pseudomona Aeuriginosa

- Staphylococcus Aureus

Ambas bacterias son comunes en ambientes y sólo se identificaron 3 colonias de éstas.

* * *

RECOMENDACIONES

1 - mejorar la efectividad de la temperatura y humedad relativa en el edificio sobre todo en el segundo piso.

2- Consultar con un ingeniero experto en ventilación para examinar la posibilidad de: 1) mover las unidades de aire fuera del edificio y colocarle filtros de mayor eficiencia, junto a la instalación de conductos de retorno. 2) realizar un estudio de ventilación y balancear el sistema de distribución de aire.

*1005
3- darle mantenimiento efectivo de limpieza y cambio de filtros a las máquinas de aire acondicionado mensualmente.

4- asegurarse de que el local adyacente a las oficinas de ADT sea desinfectado.

5- estar vigilantes a cualquier derrame de agua con residuos de sangre y otros materiales provenientes de las neveras adyacentes a las oficinas de ADT. ” Exh. 15 del Dte.
A finales de mayo de 1990, los empleados regresaron a las Oficinas de ADT. El 1ro de junio de 1990, Isaacar arrendó el primer piso del local vacío a la compañía Biomedical de Humacao. Todo estaba bien en las Oficinas de ADT, hasta que a mediados del mes de junio los empleados de ADT comenzaron a percibir que habían ocurrido derrames de agua sucia en el área del Supermercado Tremendo que colinda con las Oficinas de ADT. Era la primera vez que los empleados de ADT hayan percibido que hayan ocurridos derrames de agua sucia en la pared que colinda con el supermercado. Testimonio de Merced Vázquez, Vol; % págs. 125-126.
Alrededor de dos (2) semanas después de haber ocurrido los derrames de agua sucia, a finales de junio, comenzaron a salir manchas en las paredes que colindan con el supermercado. El 28 de junio de 1990, la funcionaría de OSHO, Rodríguez Vázquez, acudió a las oficinas de ADT en Humacao a tomar unas muestras de calidad microbiológica del aire para ser estudiadas por el Dr. Benjamín Bolaños (en adelante Dr. Bolaños). El 31 de julio de 1990, el Dr. Bolaños rindió un informe de las muestras tomadas el 28 de junio en las Oficinas de ADT en Humacao. En dicho informe, el Dr. Bolaños señaló que la concentración de hongos en las oficinas de ADT era aceptable, es decir, no constituia peligro para la salud de los empleados. El único lugar que contenía una concentración de hongos que no era aceptable era el local vacío que se encuentra al lado del segundo piso de las Oficinas de ADT. Por tal motivo, se recomendó la inmediata limpieza y desinfección del local vacío. El hongo que predomina en el local vacío era el Apergillus sp. págs. 5-6 y 12 del Estudio de hongos en las oficinas de ADT de Humacao, P. R. Julio 31,1990. Exh. 5 del Dte. El local vacío no se desinfectó.
Con fecha del 20 de julio de 1990 Merced Vázquez le escribió una carta a Echegoyen. En la misma, le informó que “el 19 de julio de 1990 realizamos una inspección visual de las paredes que separan la Oficina del Supermercado Tremendo y encontramos que nuevamente está infectadas con hongos.” Más adelante en la carta se señala que “las neveras del Supermercado están pegadas a dichas paredes y se mantienen constantemente húmedas por lo que creemos es lo que está causando la infección con hongos”. Exh. 5 del Dte.
Durante los meses de septiembre a octubre de 1990, la compañía Ecosystems & Associates realizó un estudio cualitativo sobre la calidad del aire en las Oficinas de ADT en Humacao. La técnica de estudio utilizada fue la de placa fija, en la cual las placas fijas se expusieron al ambiente que podía ser próblemático con material que permite el crecimiento de hongos. Las placas tuvieron 24 horas de exposición. Las placas fueron colocadas entre las neveras del Supermercado Tremendo y la pared que separa al supermercado de las Oficinas de ADT, en los dos (2) pisos del local de ADT y en el local vacío del segundo piso.
El resultado del estudio fue que se encontró hongos Penicillium, Aspergillus y Cladosporium en el Edificio Isaacar. El estudio reflejó que la mayor concentración de hongos se encontraba en el locaí vacío, seguido por el segundo piso del local de ADT, seguido por el primer piso del local de ADT y el Supermercado Tremendo como último. Además, durante el estudio no se observaron manchas de hongos en las paredes del Supermercado Tremendo. En el primer piso del local de ADT, algunas paredes tenían manchas de hongos. En el segundo piso del local de ADT no se observaron manchas en las paredes; sin embargo, era más caliente que el primer piso. El local vacío en el segundo piso era más húmedo, había agua, estaba sucio, había polvo, telarañas y rastros de madera. Testimonio de la Profesora Wanda Rodríguez Torres, Vol. 31, págs. 175-190.
Con fecha del 24 de octubre de 1990, Echegoyen remitió una carta a Malavé informando la resolución del *1006 contrato de arrendamiento del local de ADT en el Edificio Isaacar. La resolución del contrato de arrendamiento fue solicitada a causa de un movimiento de presión de los empleados de la Oficina de ADT de Humacao para que la agencia mudara la oficina regional a otro lugar. Págs. 19-20 de la Sentencia del 24 de junio de 1994 en Isaacar v. Administración del Derecho al Trabajo (KAC90-2107 (901)). Exh. 8 del Ddo.
II-TRAMITE JUDICIAL
El 27 de febrero de 1991 se presentó la demanda principal de autos, Jaime Benitez Maldonado, et al. v. Isaacar, et al. (CS91-300). En la misma, sesenta y nueve (69) empleados de la ADT y del Departamento de Servicios Sociales (en adelante DSS), sus cónyuges y sus respectivas sociedades legales de gananciales reclamaron compensación por alegados daños físicos, angustias y sufrimientos mentales sufridos a causa de la contaminación ambiental con hongos y levaduras que existió en las facilidades de la ADT en el Edificio Isaacar en Humacao. Los demandados fueron Isaacar, Malavé, Supermercado Tremendo, Adán Caraballo Mangual (Presidente de Tremendo Cash & Carry y denominado en adelante como Caraballo Mangual), y sus respectivas compañías aseguradoras.
Durante el extenso trámite del caso de autos, las siguientes nueve (9) demandas fueron consolidadas a la demanda de Jaime Benítez Maldonado, et al. v. Isaacar, et al. (CS91-300):
1. Alberto Baco (Adm. del FSE) y Miriam E. Burgos Sanabria v. Isaacar (CS91-1192) (Orden del 23 de septiembre de 1991)
2. Alberto Baco (Adm. del FSE) y Concepción Vázquez Rivera v. Isaacar (CS91-1193) (Orden del 1ro de octubre de 1991)
3. Alberto O. Baco (Adm. del FSE) y Ediberto Rivera Fontanez v. Isaacar (CS91-1190) (Orden del 21 de octubre de 1991)
4. Alberto Baco (Adm. del FSE) y Jesusa González Pinto v. Isaacar (CS91-0753) (Ordenes del 6 de diciembre de 1991 y 14 de agosto de 1996)
5. Alberto Baco (Adm. del FSE) y Edwin Soto Massas v. Isaacar (CS91-1256) (Orden del 24 de diciembre de 1991)
6. Alberto Baco (Adm. del FSE), Elba I. Rodríguez Flores, Nilda Rivera Ruiz, Wanda Gómez de León y Francisco Cruz Rodríguez v. Isaacar (CS91-1916) (Orden del 28 de enero de 1992)
7. Pedro Soto Ríos (Adm. del FSE) y Ana D. Cruz Vázquez v. Isaacar (HDP94-217) (Orden del 9 de enero de 1996)
8. Pedro Soto Ríos (Adm. del FSE) y Celia Hernández Rosa v. Isaacar (HDP94-0091) (Orden del 10 de enero de 1996)
9. Alberto Bacó (Adm. del FSE) y María V. Stabile Rodríguez v. Isaacar (CS91-115) (Orden del 14 de agosto de 1996)
En total, ciento nueve (109) empleados de ADT y del DSS que trabajaron o tomaron adiestramientos en las oficinas de ADT del Edificio Isaacar en Humacao, en unión a noventa y un (91) cónyuges y familiares, fueron acumulados como demandantes en el presente caso. También, el Fondo del Seguro del Estado (FSE) fue acumulado como demandante en subrogación de los gastos incurridos por dicha entidad en el tratamiento médico ofrecido a los empleados demandantes de la ADT y el DSS a causa de la contaminación de hongos *1007 ocurrido en las Oficinas de ADT en el Edificio Isaacar en Humacao En resumen, en el presente caso hubo alrededor de doscientos uno (201) demandantes.
De los ciento nueve (109) empleados de la ADT y del DSS que fueron acumulados como demandantes, sesenta y siete (67) empleados declararon durante el juicio. Otros veintinueve (29) empleados desistieron de la demanda y quince (15) empleados no declararon durante el juicio. De los noventa y uno (91) cónyuges y familiares de empleados de la ADT y del DSS que fueron acumulados, sólo treinta (30) declararon durante el juicio.
Durante el presente caso fueron acumulados como demandados las siguientes personas:
1. Isaacar, Inc.
2. Lucas Malavé Rivera y la sociedad legal de gananciales compuesta por él y su esposa.
3. Tremendo Cash & Carry, Inc.
4. Adán Caraballo Mangual y la sociedad legal de gananciales compuesta por él y su esposa.
5. Cooperativa de Seguros Múltiples
6. Eastern America Insurance Company
En relación con el demandado Caraballo Mangual y la sociedad legal de gananciales compuesta por él y su esposa, el 3 de octubre de 1991, los demandantes solicitaron al Tribunal de Primera Instancia (en adelante TPI) a que autorizara el desistimiento de la Demanda en contra de ellos. El 6 de noviembre de 1991, el TPI dictó una Sentencia de Archivo Por Desistimiento autorizando el remedio solicitado.
Además, en los casos de Baco y Ediberto Rivera Fontanez v. Isaacar (CS91-1190) y Baco y Edwin Soto Massas v. Isaacar (CS91-1256), Isaacar acumuló a la ADT como tercero demandado. Sin embargo, el 24 de febrero de 1994, después que ambos casos fueron consolidados con el caso de Jaime Benítez Maldonado, et al. v. Isaacar, et al. (CS91-300), Isaacar y la ADT firmaron dos escritos de Estipulación de Desistimiento de Demanda Contra Tercero. En los mismos, Isaacar desistió con perjuicio de las demandas contra tercero presentadas en contra de la ADT (CS91-1190 y CS91-1256). El 2 de marzo de 1994, el TPI dictó dos (2) sentencias parciales autorizando los desistimientos estipulados.
El juicio en su fondo comenzó el 31 de agosto de 1998 y terminó 19 de octubre de 2000. Se celebraron alrededor de treinta y dos (32) vistas evidenciarías. Durante las mismas prestaron testimonio sesenta y siete (67) empleados de la ADT y del DSS, treinta (30) cónyuges y familiares de los empleados demandantes, Cruz Merced Vázquez (Director Regional de la ADT en Humacao), Adán Caraballo Mangual (Presidente de Tremendo Cash & Carry) y Lucas Malavé Rivera (Presidente de Isaacar). Además, declararon como peritos de las partes demandantes Jaime Villamil Muñiz (consultor de equipos de aire acondicionados), la Profesora Migdalia Vega Torres (micóloga médica), el Dr. Agripiño Lugo Velázquez (médico internista con subespecialidad en enfermedades infecciosas) y el Dr. Enrique Martínez Lugo (medicina ocupacional). También declararon como peritos de las partes demandadas el Dr. Jorge Garib Bazain (médico infectólogo), el Ing. Eligió Farrait Ruiz (ingeniero mecánico y contratista) y el Dr. Benjamín Bolaños (microbiólogo con concentración en micología).
El 29 de junio de 2001, el TPI (Juez Hon. Luis A. Amorós Álvarez) dictó una Opinión y Sentencia en la cual declaró “HA LUGAR” las demandas y condenó a los demandados a pagar solidariamente la suma total de *1008 dos millones mil dólares ($2,001,000.00) en indemnización por los daños sufridos por los demandantes. Además, el TPI condenó a los demandados al pago de las costas, intereses desde la radicación de la demanda y la suma de $35,000.00 por concepto de honorarios de abogados. La Opinión y Sentencia fue notificada por secretaría el 12 de julio de 2001.
Oportunamente, el 27 de agosto de 2001, Isaacar, el Supermercado Tremendo, la Cooperativa de Seguros Múltiples, Malavé y la sociedad legal de gananciales compuesta por éste y su esposa y Caraballo Mangual y la sociedad legal de gananciales por éste y su esposa presentaron un Escrito de Apelación (KLAN-01-00828). En el mismo, los apelantes alegaron que el TPI cometió los siguientes once (11) errores:

“1. Erró el TPI al interpretar el contrato de arrendamiento otorgado entre la ADT e Isaacar y al no aplicar a los hechos de este caso la doctrina establecida en el caso de Viuda de Andino v. A.F.F., 96 D.P.R. 170 (1966).

2. Erró el TPI al no concluir que ADT fue negligente y que su negligencia fue la causa próxima, adecuada y eficiente de los daños reclamados por los demandantes.

3. Erró el TPI al concluir que Isaacar fue negligente y que dicha negligencia fue la causa de los daños reclamados.

4. Erró el TPI al concluir que Tremendo Cash & Carry fue negligente y que dicha negligencia fue la causa de los daños reclamados.

5. Erró el TPI al darle valor probatorio al testimonio pericial y determinación de relación causal del Dr. Agripiño Lugo y al evaluar los daños y determinar relación causal a base de dicho testimonio pericial.

6. Erró el TPI al darle valor probatorio al testimonio pericial del Dr. Enrique Martínez Lugo y al evaluar los daños a base de dicho testimonio pericial.

7. Erró el TPI al concluir que los daños reclamados por los demandantes eran imputables a los demandados.

8. Erró el TPI al no concluir que Isaacar había cumplido con sus obligaciones como arrendador bajo los artículos 1444, 1445 y 1449 del Código Civil de Puerto Rico.

9. Erró el TPI al concluir que la parte demandada fue temeraria al defenderse de la presente acción judicial.

10. Erró el TPI en la evaluación de los daños de cada uno de los demandados.

11. Erró el TPI al dictar sentencia solidaria en contra de los demandados Lucas Malavé y Adán Caraballo y las sociedades de bienes gananciales compuesta por éstos y sus esposas. ”

Luego, el 29 de julio de 2002, los apelantes-demandados del Escrito de Apelación (KLAN-01-00828) presentaron un extenso Alegato Suplementario de Demandados-Apelantes impugnando todas las reclamaciones de los empleados demandantes. El 31 de agosto de 2001, Isaacar y la Eastern American Insurance Company oportunamente presentaron un segundo escrito de apelación (KLAN-01-00841). En el mismo alegaron que el TPI cometió los siguientes seis (6) errores:

“1. Erró el TPI al determinar que lo ocurrido en el Edificio ocupado por ADT fue por la culpa y 
*1009
negligencia de Isaacar.

2. Erró el TPI al no determinar que lo ocurrido en el Edificio Isaacar ocurrió por la culpa y negligencia de ADT.

3. Erró el TPI al concluir que la única causa de los daños sufridos por los demandantes fue la presencia de hongos en el edificio ocupado por ADT.

4. Erró el TPI al interpretar el contrato de arrendamiento y determinar que ADT no es responsable por los daños sufridos por los demandantes.

5. Erró el TPI al fijar por cientos de incapacidad y evaluar los daños de los demandantes.

6. Erró el TPI al concluir que los demandados fueron temerarios y condenarlós a pagar intereses presentencia y honorarios de abogado. ”

El 26 de septiembre de 2001 ordenamos la consolidación de ambos recursos de apelación. El 17 de octubre 2001, los demandantes-apelados presentaron dos escritos titulados Moción de Desestimación por Falta de Jurisdicción. En los mismos, los demandantes-apelados solicitaron la desestimación de ambos recursos de apelación por no haber incluido en sus apéndices copia de nueve (9) demandas acumuladas, copia de la Demanda Enmendada del caso Jaime Benítez Maldonado, et al. v. Isaacar, et al. (CS91-300) y otros escritos que forman parte del expediente del caso.
Después de permitir que los apelantes presentaran sus correspondientes escritos de oposición a la desestimación, el 31 de octubre de 2001 dictamos una Resolución en la cual desestimamos ambos escritos de apelación por falta de jurisdicción. La resolución fue notificada por nuestra secretaría el 13 de noviembre de 2001.
Oportunamente, ambos apelantes presentaron sus respectivas mociones de reconsideración. El 8 de marzo de 2002 dictamos una segunda Resolución en la cual declaramos “NO HA LUGAR” ambas solicitudes de reconsideración presentadas por los apelantes. La Resolución fue acompañada por un Voto Explicativo del Juez Andrés Salas Soler, quien disintió de la Resolución. La Resolución fue notificada por secretaría el 7 de marzo de 2002.
El 5 y 11 de abril de 2002, los apelantes presentaron dos (2) peticiones de certiorari en el Tribunal Supremo. El 26 de abril de 2002, el Tribunal Supremo denegó la Petición de Certiorari presentada el 5 de abril de 2002. Luego en reconsideración, el 31 de mayo de 2002, el Tribunal Supremo dictó una Sentencia revocando la Resolución del 8 de marzo de 2002 por concluir “que los documentos omitidos en el apéndice del recurso no son realmente esenciales para adjudicar la controversia planteada ante el Tribunal de Circuito de Apelaciones, ni para constatar su jurisdicción... ”. Jaime Benítez Maldonado, et al. v. Isaacar et al. (CC-2002-269), Sentencia del 31 de mayo de 2002, pág. 8.
El 23 de octubre de 2002 ordenamos que se elevaran los autos originales del caso. Con el beneficio de haber recibido el voluminoso expediente original del caso y las transcripciones del juicio, nos encontramos en posición para resolver los recursos de apelación ante nuestra consideración.
III- DISCUSION Y APLICACION DEL DERECHO
A- Síndrome del Edificio Enfermo
*1010 El síndrome de edificio enfermo no tiene una definición exacta. Generalmente, se utiliza el término de síndrome de edificio enfermo para describir situaciones en que más del veinte por ciento (20%) de los ocupantes de un edificio sufren de molestias o síntomas agudos en su salud que están relacionadas al tiempo en que se encuentran en un edificio, pero en el cual no se ha podido identificar una enfermedad o causa específica que cause tales molestias o síntomas agudos en la salud. Los médicos han dividido los síntomas relacionados a edificios enfermos en cinco (5) grupos: (1) irritación de los ojos, la nariz y la garganta; (2) síntomas neurasténicos (dolor de cabeza, mareos, fatiga, confusión y nausea); (3) irritación de la piel; (4) reacciones de hipersensibilidad (Personas no asmáticos con síntomas de asma); (5) olores y sabores desagradables. Los síntomas usualmente, aunque no siempre, disminuyen cuando la persona está fuera del edificio. Los síntomas no concuerdan con un síndrome clínico específico y típicamente no están asociados a una fuente en específico o a un contaminante específico del aire. Michael T. Pyle, Enviromental Law in an Office Building: The Sick Building Syndrome, 9 Journal of Envtl. Law and Litigation 173, 176 (1994), y HAROLD L. HIRSH, Indoor Air Pollution, The Sick Building Syndrome (SBS) and Building Related Illness (BRI), 43(1) Medical Trial Technique Quarterly 1, 25-26 (1996).
Casos de síndrome de edificio enfermo tienden a ocurrir más en edificios nuevos con sistemas mecánicos de ventilación centrales. Según la Agencia Protectora del Ambiente (EPA), hasta un treinta por ciento (30%) de los edificios nuevos o remodelados provocan enfermedades en algunos de sus ocupantes. Individuos afectados presentan una serie de quejas indeterminadas que incluyen dolor de cabeza, irritación al respirar, síntomas similares al asma o el catarro, molestias en el pecho (chest tightness) y fatiga. Hirsh, Indoor Air Pollution, a la pág. 28. Del mismo modo, la Organización Mundial de la Salud estima que alrededor del treinta por ciento (30%) de todos los edificios nuevos o remodelados alrededor del mundo pueden estar afectados con un problema en la calidad del aire interior. Lesley King O’Neal, Et. Al., Sick Building Claims, 20 Construction Law 16, 16 (Enero 2000).
Se cree que las quejas asociadas con el síndrome de edificio enfermo están relacionadas a una compleja interacción de un número de factores. Estos factores internos del edificio incluyen: emisiones químicas y biológicas de materiales del edificio, muebles y superficies; sistemas ambientales de edificios, el uso del edificio, factores físicos, tales como temperatura, humedad, flujo del aire, ruido y luz; características individuales, tales como edad, sexo, raza, uso del cigarrillo y salud; y situaciones sociales como el stress en el trabajo, la satisfacción en el trabajo, la privacidad, etc. La naturaleza indeterminada de las quejas y la complejidad de interacción de factores hacen que el síndrome de edificio enfermo sea difícil de estudiar. Hirsh, Indoor Air Pollution, a la pág. 28.
A la luz de la evidencia presentada durante el juicio, se prueba de forma clara que el local de las Oficinas de ADT sufrió del síndrome de edificio enfermo desde finales de 1988 hasta la primera mitad del 1990. Primero, de los testimonios de Merced Vázquez y Malavé se prueba claramente que el local de las Oficinas de ADT fue una remodelación de la mitad de un local vacío del Edificio Isaacar. Además, que el local fue ocupado por los empleados de la ADT inmediatamente después que la remodelación terminó. Testimonio de Merced Vázquez, Vol. 1, págs. 25-26 y 167-169 y Testimonio de Malavé, Vol. 32, págs. 30-32. Por lo tanto, como las Oficinas de ADT fueron ocupadas recientemente después de haber sido construidas, las mismas eran más propensas a sufrir del síndrome de edificio enfermo.
Segundo, según se desprende del testimonio de Merced Vázquez y de los demandantes, desde los meses de agosto a septiembre de 1988, varias empleadas comenzaron a quejarse de tener problemas para respirar y de picazón en el cuello y los brazos. Para finales de 1988, el número de empleados que se quejaban de síntomas de problemas respiratorios y de picazón en la piel dentro de las Oficinas de ADT aumentó a veinte (20). Testimonio de Merced Vázquez, Vol. I, págs. 50-56.
La situación de contaminación dentro de las oficinas de ADT fue aumentando a niveles alarmantes. Para el *1011 27 de marzo de 1990, setenta (70) empleados de un total de ciento tres (103) empleados que trabajan en las Oficinas de ADT se habían reportado al FSE por problemas relacionados a picor en el cuerpo, problemas respiratorios, alergias, fatigas, parálisis faciales, entre otros problemas relacionadas al ambiente de las Oficinas de ADT en el Edificio Isaacar en Humacao. Expediente de OSHO, Exh. 5 del Dte. Sentencia del 29 de junio de 2001, págs. 9 y 18. Es decir, para el 27 de marzo de 1990, un 67.9% de todos los empleados de las Oficinas de ADT en el Edificio Isaacar en Humacao estaban sufriendo molestias y síntomas agudos en su salud relacionados a su presencia en su área de trabajo. Lo que significa que la situación de salud laboral existente en las Oficinas de ADT cumplió con los elementos contenidos en la definición de síndrome de edificio enfermo.
Tercero, cuando OSHO dictó la Citación y Notificación de Penalidades el 20 de abril de 1990, es que se pudo conocer de manera certera que la causa de los síntomas y molestias sufrida por los empleados era a causa de una contaminación de hongos en las Oficinas de ADT en el Edificio Isaacar en Humacao. Expediente de OSHO, Exh. 5 del Dte. De esta manera se probó de manera objetiva que las Oficinas de ADT en el Edificio Isaacar en Humacao sufrió del síndrome de edificio enfermo a causa de la contaminaciqn del aire interior con hongos.
En resumen, el TPI correctamente determinó que las Oficinas de ADT en el Edificio Isaacar en Humacao sufrió del síndrome de edificio enfermo. Sentencia del 29 de junio de 2001, pág. 12. Tal situación afectó la salud y ocasionó daños a los demandantes, quienes en su mayoría fueron empleados de la ADT. Como correctamente concluyó el TPI, tales daños sufridos por los demandantes a causa de la contaminación por hongos que existió en las Oficinas de ADT pueden dar lugar a una causa de acción por daños y perjuicios a la luz del Artículo 1802 del Código Civil. Sentencia del 29 de junio de 2001, pág. 26.
B- Art. 1802 del Código Civil
El Artículo 1802 del Código Civil (31 L.P.R.A. § 5141) establece lo siguiente:

“El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización. ”

“Este precepto está inspirado en el deber general de todas las personas de actuar con la debida circunspección. Para que prospere una causa de acción bajo este artículo es necesario que concurran tres (3) requisitos: un acto u omisión culposo o negligente; que cause daño; y que exista una relación causal ente el acto u omisión y el daño sufrido.” Municipio de San Juan v. Bosque Real, S.E., 2003 J.T.S. 33, a la pág. 636. Ver además a Blás v. Hosp. Guadalupe, 146 D.P.R. 267, 322 (1998), y Montalvo v. Cruz, 144 D.P.R. 748, 755 (1998).
En el presente caso, los demandantes sufrieron daños a causa de que en las Oficinas de ADT en el Edificio Isaacar en Humacao ocurrió el síndrome de edificio enfermo. Por lo tanto, el requisito de haber sufrido daños fue probado por los demandantes de manera general. Sin embargo, los apelantes-demandados alegan que a la luz de la evidencia presentada durante el juicio no se probó que ellos hayan sido negligentes o culpables, ni que su alegada culpa o negligente haya sido la causa de los daños sufridos por los demandantes por motivo del síndrome de edificio enfermo de las Oficinas de ADT en el Edificio Isaacar en Humacao. Veamos.
C- Culpa y Negligencia
“La culpa o negligencia es la falta del debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, o la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias. Ramos v. Carlo, 85 D.P.R. 353, 358 (1962), La necesidad de una convivencia social *1012 ordenada impone un deber general de corrección y prudencia en relación con los demás ciudadanos, y el acto es ilícito en sentido extracontractual cuando viola deberes generales de corrección o conducta correcta, deberes que no están escritos en los códigos, pero que representan el presupuesto mínimo sobreentendido del orden de la vida social. ” Toro Aponte v. E.L.A., 142 D.P.R. 464, 473 (1997)
En el Artículo 1802 del Código Civil, la culpa y la negligencia no son sinónimos. La culpa requiere la ejecución de un acto positivo que cause un perjuicio a otra persona distinta de la que lo llevó a cabo. Mientras que la negligencia supone una omisión que produzca un perjuicio a otra persona. Toro Aponte v. E.L.A., 142 D.P.R. a las págs. 473-474. Además, la culpa consiste en la omisión de la diligencia exigible, mediante cuyo empleo podría haberse evitado el resultado dañoso. A su vez, la diligencia exigible es la que cabe esperar del ser humano promedio, el buen pater familias. Si el daño es previsible por éste, hay responsabilidad; si el daño no es previsible, estamos generalmente en presencia de un acto fortuito. Montalvo v. Cruz, 144 D.P.R. a la pág. 756 y Toro Aponte v. E.L.A., 142 D.P.R. a la pág. 473.
En adición, para determinar si una omisión genera responsabilidad, se considerarán los elementos siguientes: (1) la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño, el incumplimiento del cual constituye lo antijurídico, y (2) si de haberse realizado el acto omitido, se hubiera evitado el daño. Toro Aponte v. E.L.A., 142 D.P.R. a la pág. 474, y Monllor v. Soc. de Gananciales, 138 D.P.R. 600, 604-605 (1995).
a- Responsabilidad de Isaacar
Los apelantes-demandados alegan que el TPI erró al concluir que Isaacar fue negligente y que dicha negligencia fue la causa de los daños reclamados. Resolvemos que el error alegado por los apelantes-demandados no fue cometido. Primero, de la evidencia presentada durante el juicio surge que Isaacar fue negligente debido a que mantuvo un local vacío abandonado y con desechos orgánicos en el Edificio Isaacar, conociendo que colindante a ese local vacío había oficinas en uso y un supermercado. Tal situación razonablemente podría causar problemas de salud a las personas en las oficinas y a los empleados y consumidores del supermercado. Segundo, Isaacar, actuó de manera culpable al arrendar un local para oficinas sin los permisos de la Administración de Reglamentos y Permisos (ARPE) requeridos por ley. Veamos.
Del testimonio de testigos y peritos surge de manera repetida que Isaacar mantuvo el local vacío del Edificio Isaacar con desechos orgánicos, sucio y en total abandono. Merced Vázquez declaró que cuando las Oficinas de ADT se mudaron al Edificio Isaacar el local vacío “tenía material deshecho de la construcción que habían efectuado en ADT cuando nosotros nos mudamos”. Testimonio de Merced Vázquez, Vol. I, pág. 25. Dicho testimonio fue corroborado en parte por Malavé cuando declaró que en el local vacío se almacenó todo el sobrante de planchas de “gypsum board”, de “frames” que se ponen en las instalaciones de las planchas y otro material que les sobró de la construcción de las facilidades de ADT. Testimonio de Malavé, Vol. 32, págs. 35 y 41-42.
También se observa el abandono del local vacío cuando el viernes antes de pasar el Huracán Hugo, Merced Vázquez llamó por teléfono a Malavé para preguntarle qué medidas iba a tomar para proteger el edificio del huracán. Malavé le contestó que no se haría nada. Que no haría nada para proteger el edificio. Testimonio de Merced Vázquez, Vol. 1, págs. 41-43 y 150-152. Dicho testimonio fue corroborado en parte por el propio Malavé cuando declaró que él no pasó por el Edificio Isaacar antes del Huracán Hugo. Testimonio de Malavé, Vol. 32, pág. 118. Además, quedó establecido que Isaacar no tenía personal fijo en el Edificio Isaacar para hacer labores de mantenimiento, aun cuando Isaacar estaba a cargo del mantenimiento del Edificio Isaacar. Testimonio de Malavé, Vol. 32, págs. 94-105.
Del mismo modo, la Prof. Rodríguez Torres declaró que cuando visitó el local vacío durante octubre de *1013 1990, lo encontró húmedo, sucio, con rastros de madera, polvo, telarañas y con charcos de agua. Testimonio de la Prof. Rodríguez Torres, Vol. 31, págs. 186 y 190.
Además, en los estudios realizados por PES y el Dr. Bolaños reflejaron que el local vacío estaba contaminado y recomendaron su desinfección. Exh. 5 y 15 del Dte. La alta concentración de hongos en el local vacío también fue corroborada por el estudio de la Prof. Rodríguez Torres. Testimonio de la Prof. Rodríguez Torres, Vol. 31, págs. 183 y 185-186. Sin embargo, de la evidencia presentada en el juicio no surge que en algún momento se haya desinfectado el local vacío.
Por lo tanto, el TPI no erró al determinar que el local sucio jamás se limpió. Sentencia del 29 de junio de 2001, pág. 15. Tampoco el TPI erró cuando concluyó que Isaacar tenía el deber de mantener el local vacío limpio y seguro. Id. Págs. 12 y 27. Es un principio del derecho de vecindad que el dueño de una propiedad tiene el derecho a dedicarla a cualquier negocio o uso lícito, que no constituya una perturbación per se, siempre que no cause inconvenientes irrazonables a sus vecinos en el uso y disfrute dé sus respectivas propiedades o que afecte a la salud y la vida de la cohiunidad. Dicho principio de derecho vecinal está plasmado a través de distintos estatutos en nuestro ordenamiento jurídico, como serían los artículos 526 y 1806 al 1808 del Código Civil (31 L.P.R.A. §§ 1802 y 5145-5147), el Artículo 277 del Código de Enjuiciamiento Civil (32 L.P.R.A. § 2761), los artículos 329 y 330 del Código Penal de 1937 (33 L.P.R.A. §§ 1365-1366) y el derecho ambiental en general. Véase además a Mariano A. Alonso Perez, Las Relaciones De Vecindad, 36 ADC 357 (1983).
También Isaacar actuó de manera culpable cüando arrendó el local del Edificio Isaacar sin los permisos de ARPE, según surge del Informe de Inspección efectuado por el Cuerpo de Bomberos del 29 de marzo de 1990. Exh. 5 del Dte. A tenor con los artículos 16 y 17 dé la Ley Orgánica de la Administración de Reglamentos y Permisos, Ley Núm. 76 del 24 de junio de 1975 (23 L.P.R.A. §§ 71o y 7Ip), Isaacar no podía arrendar el local remodelado a ADT sin haber obtenido previamente el correspondiente permiso de ARPE. Fue ésta la causa por la cual el local tenía tantos desperfectos como aires acondicionados que no toman aire del exterior, baños cerrados sin extractores de aire, puertas de entrada peligrosa, falta de insulación del techo del segundo piso, entre muchos otros. Fue esta situación de remodelación ilegal lo que contribuyó a que las Oficinas de ADT en el Edificio Isaacar hubiera sufrido del síndrome de edificio enfermo.
En el presente caso, quedó probado que la causa de la contaminación de las Oficinas de ADT en el Edificio Isaacar fue por el estado de abandono en que Isaacar mantuvo el local vacío combinado con su uso como almacén de materiales de construcción. Fueron esas condiciones lo que permitió que materiales orgánicos como madera y polvo fueran mojados por las lluvias Creando un ambiente húmedo propicio para la contaminación de hongos. Testimonio del Dr. Bolaños, Vol. 31,- págs. 82-84. También fue el estado de abandono del local vacío lo que llevó a que las Oficinas de ADT se hubieran inundado durante y después del paso del Huracán Hugo. De Malavé haber enviado personal al Edificio Isaacar para asegurarlo, éstos hubieran cerrado las ventanas del local vacío y hubieran tomados otras medidas que probablemente hubieran evitado la inundación de las Oficinas de ADT. Fueron estas inundaciones de las Oficinas de ADT uno de los factores que propiciaron su contaminación con hongos. Ver Testimonio de Bolaños, Vol. 31, págs. 98-100 y 103-104; y el Testimonio de Merced Vázquez, Vol. 1, pág. 56.
Una vez contaminado el local vacío, la evidencia muestra que dicha contaminación de hongos pasó al local de ADT por la interconexión del techo del segundo piso del local vacío con el techo de las Oficinas de ADT, la puerta de emergencia, huecos en la pared divisoria entre ambos locales y por la presión negativa creada por los acondicionadores de aire. Ver el Testimonio de Ing. Ferrait Ruiz, Vol. 31, págs. 22-23, 31-34, 40 y 50-52; Testimonio de la Prof. Vega Torres, Vol. 2, pág. 56 y 66; Testimonio de Villamil Muñiz, Vol. 1, págs. 203-204, 222. Una vez la contaminación de hongos llegó a las Oficinas de ADT, la misma fue regada por la oficina por los sistemas de acondicionadores de aire. La contaminación de hongos fue promovida por la inundación del local de ADT, la existencia de aires acondicionados que no toman aire del exterior, entre otros factores. Ver *1014 Testimonio de Bolados, Vol. 31, págs. 98-100 y 103-104, y Testimonio de Merced Vázquez, Vol. 1, pág. 56; Testimonio de Villamil Muñiz, Vol. 1, págs. 196-200, 204, 207-211.
En conclusión, el TPI no erró al concluir que la culpa y negligencia de Isaacar fue responsable de los daños causados a los demandantes por motivo del síndrome de edificio enfermo que ocurrió en las Oficinas de ADT en el Edificio Isaacar en Humacao. Sentencia del 29 de junio de 2001, págs. 10, 12 y 27.
Los apelantes-demandados alegan que Isaacar no es responsable de los daños sufridos por los demandantes porque ADT no cumplió con sus obligaciones como arrendataria bajo el Art. 1449 del Código Civil, ya que no puso en conocimiento al arrendador Isaacar, “en el más breve plazo posible” de las obras que eran necesarias para contrarestar o eliminar la contaminación de hongos que estaba afectando las Oficinas de ADT. El error no fue cometido.
El Artículo 1444 del Código Civil (31 L.P.R.A. § 4051) establece en lo pertinente lo siguiente:

“El arrendador está obligado:

(1) A entregar al arrendatario la cosa objeto de contrato.

(2) A hacer en ella durante el arrendamiento todas las reparaciones necesarias a fin de conservarla en estado de servir para el uso a que ha sido destinada. ”

El Artículo 1449 del Código Civil (31 L.P.R.A. § 4056) establece:

“El arrendatario está obligado a poner en conocimiento del propietario, en el más breve plazo posible, toda usurpación o novedad dañosa que otro haya realizado o abiertamente prepare en la cosa arrendada.

También está obligado a poner en conocimiento del dueño, con la misma urgencia, la necesidad de todas las reparaciones comprendidas en el inciso (2) déla see. 4051 de este título.

En ambos casos será responsable el arrendatario de los daños y perjuicios que por su negligencia se ocasionaren al propietario. ”

El Artículo 1449 del Código Civil no es de aplicación en el presente caso, debido a que las obras que Isaacar realizó en las oficinas de ADT durante el 1990 no eran reparaciones necesarias de conservación a tenor con el inciso (2) de Art. 1444. Nos explicamos.
El inciso (1) del Art. 1444 del Código Civil establece que el arrendador está obligado a entregar al arrendatario la cosa objeto del contrato. Esa obligación exige que el arrendador entregue la cosa arrendada en tal situación que permita al arrendatario hacer de ella el disfrute que se proponía. Cole v. Escambrón Development Co., 73 D.P.R. 520, 529 (1952). Es decir, el inciso (1) del Art. 1444 del Código Civil establece una garantía en la cual el arrendador va a responder de los vicios de la cosa arrendada que impidan o dificulten su disfrute por el arrendatario. Goenaga v. West Indies Trading Corp., 88 D.P.R. 865, 899 (1963).
Por el otro lado, el inciso (2) del Artículo 1444 del Código Civil establece la obligación del arrendador a realizar todas las reparaciones necesarias en la cosa arrendada para conservarla en estado de servir para el uso que la cosa arrendada ha sido destinada. En otras palabras, las reparaciones a que se refiere el inciso (2) del artículo 1444 del Código Civil son reparaciones necesarias de conservación de la cosa. Es decir, son aquellas reparaciones que son necesarias a causa del desgaste natural de la cosa, a los deterioros por el mero transcurso del tiempo, del uso ordinario del arrendatario y las pérdidas que ocasione un caso fortuito o de fuerza mayor. *1015 Castro Anguita v. Figueroa, 103 D.P.R. 847, 852 (1975), y X(II) D. Jose Maria Manresa y Navarro, Comentarios al Codigo Civil Español; 126 (6ta Ed. 1969).
Como explicamos anteriormente, la razón por la cual el local de ADT tenía tantos desperfectos (vicios) fue porque la misma fue construida ilegalmente. Por lo tanto, los vicios que fomentaron la contaminación del local de ADT, y que Isaacar reparó, eran vicios que existían en el local cuando ADT lo ocupó. Eran vicios que estaban relacionados a la mala remodelación del local y no a la conservación del local por el desgaste natural de la cosa, o a deterioros por el transcurso del tiempo, o del uso ordinario del local, o a un caso fortuito o de fuerza mayor.
En conclusión, los vicios del local de ADT que fueron reparados por Isaacar eran vicios de la construcción de remodelación que tenían que ser realizados a tenor con el inciso (1) del Art. 1444 del Código Civil y no reparaciones de conservación a tenor con el inciso (2) del mencionado artículo. El Artículo 1449 del Código Civil no es de aplicación en el presente caso. El error alegado por los apelantes-demandados no fue cometido.
b- Responsabilidad de ADT
Los apelantes-demandados alegan que el TPI cometió error al no concluir que ADT fue negligente y que su negligencia fue la causa próxima de los daños reclamados por los demandantes. El error alegado por los apelantes-demandados no fue cometido.
Aunque de la evidencia presentada durante el juicio existe la posibilidad que se pudiera determinar que ADT fue co-causante de los daños sufridos por los demandantes, el TPI no podía concluir que ADT fue negligente, ni imponerle responsabilidad por los daños sufridos por los demandantes porque ADT no es parte en el presente caso. Un tribunal no puede dictar sentencia contra una persona que no está acumulada en un caso como parte, por ser contrario al debido proceso de ley. Richards v. Jefferson County, Ala., 116 S. Ct. 1761 (1996). En el presente caso, ADT no fue parte del caso durante el juicio, ni sus intereses fueron defendidos por alguna de las partes. Por lo tanto, el TPI y esta curia está impedida de resolver que ADT fue co-causante de los daños sufridos por los demandantes.
Del mismo modo, Isaacar está impedida de exigir la nivelación de la responsabilidad de los daños con ADT cuando desistió con perjuicio de su demanda contra tercero en contra ADT. Nos explicamos.
En los casos de Baco y Ediberto Rivera Fontanez v. Isaacar (CS91-1190), y Baco y Edwin Soto Massas v. Isaacar (CS91-1256), Isaacar acumuló a la ADT como tercero demandado. Además, “[d]esde los comienzos de este litigio, la parte demandada [(Isaacar] levantó como defensa que la contaminación en el ambiente de trabajo de los empleados de ADT (aquí demandantes) se debió a la negligencia de dicha agencia gubernamental al no proveer un mantenimiento adecuado, tanto al sistema de aire acondicionado como al local arrendado. ” Escrito de Apelación (KLAN-01-00828), pág. 12. Ver además las defensas afirmativas núm. 12 y 14 de la Contestación a Demanda Enmendada presentada por Isaacar Inc. el 5 de febrero de 1992 en el caso Jaime Benitez Maldonado, et al. v. Isaacar, et al. (CS91-300).
Sin embargo, el 24 de febrero de 1994, después que ambos casos fueron consolidados con el caso de Jaime Benítez Maldonado, et al. v. Isaacar, et al. (CS91-300), Isaacar y la ADT firmaron dos escritos de Estipulación de Desistimiento de Demanda Contra Tercero. En los mismos, Isaacar desistió con perjuicio de las Demandas Contra Tercero presentadas en contra de la ADT (CS91-1190 y CS91-1256). El 2 de marzo de 1994, el TPI dictó dos (2) sentencias parciales autorizando los desistimientos estipulados.
La estipulación constituye una admisión judicial que implica un desistimiento formal de cualquier contención contraria a ella. Existen diversas clases de estipulaciones: (1) las que constituyen admisiones de *1016 hechos y dispensan del requisito de probar tales hechos; (2) las que reconocen derechos y tienen el alcance de una adjudicación respecto a tales derechos, y (3) las que proponen determinado curso de acción, como por ejemplo, que se celebre una conferencia con antelación al juicio o que se someta un asunto a la consideración de un comisionado especial. Además, las estipulaciones tienen como finalidad evitar dilaciones, inconvenientes y gastos, y su uso debe alentarse para lograr el propósito de hacer justicia. Ahora bien, si existe duda en cuanto a la intención de las partes, se debe adoptar la contención que sea más favorable para la persona a cuyo favor se hizo la estipulación. Ramos Rivera v. E.L.A., 148 D.P.R. 118, 126 (1999).
Una vez suscrita por las partes y aceptada por el tribunal, la estipulación que finaliza un pleito o un incidente en su transcurso, constituye un contrato de transacción que obliga a las partes y tiene efecto de cosa juzgada. Ramos Rivera v. E.L.A., 148 D.P.R. a la pág. 127, 129-131, e Igaravidez v. Ricci, 147 D.P.R. 1, 5-6 (1998).
En el presente caso, Isaacar había acumulado a la ADT como tercero demandado en los casos de Baco y Ediberto Rivera Fontanez v. Isaacar (CS91-1190), y Baco y Edwin Soto Massas v. Isaacar (CS91-1256). A finales de 1991, ambos casos fueron consolidados con el caso de Jaime Benitez Maldonado, et al. v. Isaacar, et al. (CS91-300) y otros casos relacionados a reclamaciones por daños a Isaacar a causa del síndrome de edificio enfermo ocurrido en las Oficinas de ADT. Es decir, todos los casos consolidados eran sobre el mismo asunto y básicamente sobre la misma controversia, la reclamación de indemnización por los daños ocasionados a empleados de la ADT y del DSS por motivo de la contaminación de hongos ocurrida en las Oficinas de ADT en el Edificio Isaacar en Humacao. Sin embargo, conociendo que la ADT podía ser causante o co-causante de los daños alegado por los demandantes en todas las demandas consolidadas con los casos Baco y Ediberto Rivera Fontanez v. Isaacar (CS91-1190), y Baco y Edwin Soto Massas v. Isaacar (CS91-1256), el 24 de febrero de 1994, Isaacar y la ADT firmaron dos escritos de Estipulación de Desistimiento de Demanda Contra Tercero en los cuales Isaacar desistió con perjuicio de las demandas contra tercero presentadas en contra de la ADT. Luego, el 2 de marzo de 1994, el TPI dictó dos (2) sentencias parciales autorizando los desistimientos estipulados.
Es decir, Isaacar, teniendo a ADT acumulado como tercero demandado y teniendo la oportunidad para demostrar en juicio que ADT fue el responsable o co-causante de los daños reclamados por los demandantes, desiste con perjuicio de las demandas contra tercero y deja ir a la ADT como parte en los casos. El Tribunal Supremo ha resuelto constantemente que una sentencia dictada en un pleito anterior impide que se litiguen en un pleito posterior las cuestiones ya litigadas y adjudicadas y aquéllas que pudieron haber sido litigadas con propiedad en la acción anterior. Díaz v. Navieras de Puerto Rico, 118 D.P.R. 297, 305 (1987; Pagán Hernández v. U.P.R., 107 D.P.R. 720, 732-733 (1978); y Capó Sánchez v. Srio. de Hacienda, 92 D.P.R. 837, 839 (1965). Resolvemos que el principio de cosa juzgada debe ser aplicado con el mismo alcance en los desistimientos con perjuicio que son autorizados por un tribunal. Como el TPI dictó sentencias parciales autorizando el desistimiento con perjuicio que Isaacar hizo a favor de la ADT, entonces Isaacar está impedida por la doctrina de cosa juzgada a reclamar a un tribunal que declare a la ADT co-causante de los daños reclamados por los demandantes en el presente caso. Al Isaacar desistir con perjuicio de las demandas contra tercero en contra de la ADT, ésta renunció a reclamar la nivelación de los daños reclamados por los demandantes. En conclusión, el error alegado por los apelantes-demandados no fue cometido.
c- Responsabilidad de Tremendo Cash & Carry, Inc.
En el Escrito de Apelación, KLAN-01-00828, se alega que el TPI erró al concluir que Tremendo Cash & Carry fue negligente y que dicha negligencia fue la causa de los daños reclamados. El error alegado fue cometido. Del estudio de la evidencia presentada durante el juicio surge que el Supermercado Tremendo no fue negligente o culpable, ni que fue responsable por los daños sufridos por los demandantes.
*1017 Primero, el propietario del Edificio Isaacar es Isaacar, Supermercado Tremendo es un arrendatario de una parte del Edificio Isaacar. Testimonio de Caraballo Mangual, Vol. 31, págs. 63-64; y Testimonio de Malavé, Vol. 32, págs. 25-29.
Segundo, originalmente, el Edificio Isaacar fue construido para ser usado como un negocio de venta de comestibles al detal y al por mayor llamado Plaza Gigante. Luego, el 15 de diciembre de 1987, Isaacar vendió las operaciones de Plaza Gigante en Humacao a Supermercado Tremendo y se redujeron las operaciones del negocio a 45,000 pies cuadrados en el Edificio Isaacar. De esta manera, Isaacar reservó 15,000 pies cuadrados del Edificio Isaacar para arrendarlos a otras personas. Testimonio de Caraballo Mangual, Vol. 31, págs. 63-64; y Testimonio de Malavé, Vol. 32, págs. 27-29.
Por lo tanto, Supermercado Tremendo realizaba las operaciones de negocio de ventas de comestibles al detal en un edificio que estaba destinado para tal uso. Además, el Supermercado Tremendo estaba operando en el Edificio Isaacar antes que la ADT se mudara al Edificio Isaacar.
Tercero, nada tuvieron que ver los dueños del Supermercado Tremendo con el arrendamiento del local del Edificio Isaacar a ADT. Testimonio de Merced Vázquez, Vol. 1, págs. 167-169; y Testimonio de Malavé, Vol. 32, págs. 30-32.
Cuarto, el propietario y arrendador Isaacar es la persona responsable de habilitar el Edificio Isaacar para los usos de los distintos arrendatarios. Art. 1444 del Código Civil.
Quinto, el lavar las neveras de un supermercado no es un acto antijurídico. Todo lo contrario, por motivos de sanidad, en los supermercados se deben lavar las neveras periódicamente. Testimonio de Caraballo Mangual, Vol. 31, págs. 65-66 y 69. Además, las neveras del Supermercado Tremendo tenían tuberías de desagües para evitar liqueos de agua. Testimonio de Caraballo Mangual, Vol. 31, págs. 64-66.
Sexto, la primera vez que empleados de la ADT percibieron derrames de agua sucia en la pared de ADT que colindaba con el Supermercado Tremendo fue a mediados del mes de junio de 1990. Alrededor de dos (2) semanas después de haber ocurrido los derrames de agua sucia, a finales del mes de junio, comenzaron a salir manchas en las paredes que colindan con el supermercado. Testimonio de Merced Vázquez, Vol. I, págs. 125-127.
Sin embargo, el 28 de junio de 1990, la funcionaría de OSHO, Rodríguez Vázquez, acudió a las Oficinas de ADT en Humacao a tomar unas muestras para ser estudiadas por el Dr. Bolaños. El 31 de julio de 1990, el Dr. Bolaños rindió un informe de las muestras tomadas el 28 de junio en las Oficinas de ADT en Humacao. En dicho informe, el Dr. Bolaños informó que la concentración de hongos en las Oficinas de ADT eran aceptables. Es decir, no constituyen peligro para la salud de los empleados. Testimonio de Merced Vázquez, Vol. I, págs. 128-159; y Exh. 5 del Dte.
Además, la Prof. Rodríguez Torres hizo un estudio de calidad de aire en el Supermercado Tremendo y las Oficinas de ADT durante los meses de septiembre a octubre de 1990. Durante su testimonio en juicio, ella declaró que cuando visitó el Supermercado Tremendo encontró que el área entre las neveras y la pared se veía bastante limpia. Que dicha área estaba muy recogida. Que se observaron las paredes cuidadosamente para ver si había manchas de hongos, pero no encontraron manchas en la pared. Que el área estaba aceptable. Testimonio de la Prof. Rodríguez Torres, Vol. 31, págs. 179-180.
Séptimo, para abril de 1990, todas las personas que fueron afectadas con la contaminación de hongos en las Oficinas de ADT en el Edificio Isaacar ya estaban afectadas. Testimonio de Merced Vázquez, Vol. 1, págs. 144-145; Exh. 5 del Dte. Es decir, las personas que fueron afectadas por la contaminación de hongos sufrieron los daños antes de que alegadamente hubieran ocurrido los derrames de agua sucia en las neveras de *1018 Supermercado Tremendo.
Octavo, la Prof. Vega Torres declaró que cuando visitó el local de ADT en el Edificio Isaacar, ella pudo observar y oler que en las paredes del local de ADT que colindaban con las neveras del supermercado había crecido hongos. Además, ella declaró que encontró que en el Supermercado Tremendo hubo agua y todavía habían hongos. Testimonio de la Prof. Vega Torres, Vol. 2, págs. 57-58. Sin embargo, la Prof. Vega Torres visitó por primera vez el Edificio Isaacar en el 1997. Testimonio de la Prof. Vega Torres, Vol. 2, págs. 5-7. Por lo tanto, a la luz del testimonio de la Prof. Rodríguez Torres, las manchas de hongo que la Prof. Vega Torres encontró en el Supermercado Tremendo debieron haber surgido después de octubre de 1990. Como la ADT resolvió el contrato de arrendamiento el 24 de octubre de 1990, entonces dichas manchas de hongo que la Prof. Vega Torres encontró en el Supermercado Tremendo no pudieron haber afectado a los demandantes. Págs. 19-20 de la Sentencia del 24 de junio de 1994 en Isaacar v. Administración del Derecho al Trabajo (KAC90-2107 (901)). Exh. 8 del Ddo.
En conclusión, de la evidencia presentada durante el juicio no surge que Supermercado Tremendo haya sido negligente o cometido actos culpables, ni que haya sido responsable por los daños sufridos por los demandantes. El TPI erró al concluir que el Supermercado Tremendo fue co-causante de los daños sufridos por los demandantes.
d- Responsabilidad de Caraballo Mangual y Malavé
En el Escrito de Apelación, KLAN-01-00828, se alegó que el TPI erró al dictar sentencia solidaria en contra de los demandados Malavé y Caraballo Mangual y las sociedades de gananciales compuestas por éstos y sus esposas. El 11 de junio de 2002, el TPI dictó una Resolución y/o Sentencia Enmendada en la cual aclaró que entre los demandados condenados a pagar los daños reclamados por los demandantes no estaban incluidos Malavé, ni Caraballo Mangual, ni las sociedades de gananciales compuestas por éstos y sus esposas. La Resolución y/o Sentencia Enmendada fue notificada por secretaría el 14 de junio de 2002. El error alegado ya fue resuelto.
D- Admisibilidad del Testimonio Pericial
En el Escrito de Apelación, KLAN-01-00828, se alega que el TPI erró al darle valor probatorio a los testimonios de los doctores Lugo y Martínez. Las alegaciones de error se basaron principalmente en el hecho de que el Dr. Lugo no evaluó a los demandantes cuando éstos sufrieron los daños a causa del síndrome de edificio enfermo y su diagnóstico se basó principalmente en la información contenida en el expediente médico del FSE (diagnóstico retroactivo). Que ante esta situación, los peritos que debieron haber declarado durante el juicio con relación a los daños sufridos por los demandantes eran los médicos del FSE que atendieron a los demandantes y no el Dr. Lugo.
Con relación al Dr. Martínez se alegó que su testimonio no era admisible, porque el Dr. Martínez no vio ni examinó personalmente a los demandantes para fijar el por ciento de impedimento físico permanente de cada demandante. Que sus determinaciones de incapacidad física permanentes se basaron en los expedientes médicos del FSE y los informes del Dr. Lugo. Que según su testimonio, el Dr. Martínez fijó los porcentajes de impedimento físico permanente de los demandantes siguiendo las Guías Para la Evaluación de Impedimento Permanente publicado por la Asociación Médica Americana (American Medical Association, Guides to the Evaluation of Permanent Impairment (4th Ed. 1993)). Que según la mencionada guía, el médico que vaya a determinar el impedimento físico permanente de un paciente debe examinarlo personalmente, algo que el Dr. Martínez no hizo con los demandantes. Resolvemos que el error alegado no fue cometido. Nos explicamos.
El testimonio pericial está regulado principalmente por las Reglas 52 a la 59 de las Reglas de Evidencia de 1979 (32 L.P.R.A. Ap. IV, R. 52-59). A tenor con las citadas reglas, un perito es la “persona ‘que posee *1019 especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficientes’ sobre un asunto. Su cobertura es dilatada. ‘No sólo cualifican los ‘expertos’ en sentido estricto (médicos, científicos, arquitectos, ingenieros, etc.), sino cualquier persona que ajuicio del juez que preside la causa tiene alguna preparación o conocimiento especial sobre la materia objeto de la declaración. Aun la experiencia se incluye como criterio. ” San Lorenzo Trad., Inc. v. Hernández, 114 D.P.R. 704, 710-711 (1983). Una de las diferencias principales entre el perito y el testigo es que el testimonio del testigo se limita a hechos percibidos por sus sentidos, mientras que el perito puede declarar sobre hechos no percibidos sobre sus sentidos, siempre que su opinión se base en una fuente en la cual los expertos de su campo generalmente descansen en ella para formar opiniones. Id., págs. 712-713 y 718. Por tal motivo, la Regla 56 de Evidencia establece lo siguiente:

“Las opiniones o inferencias de un testigo pericial pueden estar basadas en hechos o datos percibidos por el perito o dentro de su conocimiento personal o informados a él antes o durante el juicio o vista. Si se trata de materia de naturaleza tal que generalmente los expertos en ese campo descansan en ella para formar opiniones o hacer inferencias sobre el asunto en cuestión, la materia no tiene que ser admisible en evidencia. ”

Los autores de las Reglas de Evidencia explicaron la citada regla de' la siguiente manera:

“La regla pretende liberar la norma relativa al fundamento del testimonio pericial. No se requiere la “pregunta hipotética ” como base del testimonio pericial, aunque ese siga siendo uno de los modos de presentar el testimonio del perito. Bajo la regla, los hechos o datos Sobre los cuales puede descansar la opinión pericial pueden clasificarse en tres tipos básicos, a saber:

(i) Observaciones directas del perito; ejemplo: el médico que ha observado el paciente y declara sobre la condición de éste.

(ii) Información en el juicio; ejemplo: pregunta hipotética en relación al paciente.

(iii) Ninguna de las anteriores; ejemplo: el médico declara sobre la condición del paciente a base de lo que ha conocido del caso por los récords del hospital e información recibida de las enfermeras y otros doctores.

La tercera fuente es la que hace más amplia o flexible la regla y se adopta con criterio realista: así es que funcionan los expertos fuera de corte. Se altera así lo resuelto por el Tribunal Supremo en Pueblo v. Reyes Acevedo, 100 D.P.R. 703 (1972). La Regla 58, además del contrainterrogatorio al perito, provee suficientes mecanismos para colocar el testimonio pericial en su justa perspectiva y en su justo valor probatorio. ” 32 Reglas Lexis-Nexis de Puerto Rico, Inc., Leyes de Puerto Rico Anotadas, 521 (2001). Vér además a Pueblo v. Rivera Robles, 121 D.P.R. 858, 870-872 (1988).
Por lo tanto, el hecho de que el Dr. Lugo no haya atendido o examinado a los demandantes en las fechas en que ocurrieron los daños por el síndrome de edificio enfermo no convierte en inadmisible su testimonio. Del mismo modo, los demandantes no tenían la obligación de presentar como testigos a los médicos del FSE que atendieron los demandantes cuando ocurrieron los daños para que los mismos sean admisibles. El testimonio del Dr. Lugo puede ser suficiente para ayudar al tribunal a entender la información contenida en los expedientes médicos de los demandantes y los daños sufrido por éstos a causa del síndrome de edificio enfermo.
El exigir que los demandantes tengan que traer al juicio a los médicos del FSE que atendieron a los demandantes cuando éstos sufrieron los daños, para admitir la información contenida en los expedientes médicos, es contrario a la flexibilidad que el legislador quiso dotar a la evidencia pericial. Además, también es contrario a la norma de que las Reglas de Evidencia “se interpretarán flexiblemente y deforma que garanticen una solución justa, rápida y económica a cualquier problema evidenciario. ” Regla 2 de Evidencia (32 L.P.R.A. Ap. IV, R. 2). En adición, a tenor con las Regla 23.1 de Procedimiento Civil (32 L.P.R.A. Ap. III, R. 23.1), los *1020 médicos que atendieron a los demandantes pueden ser objeto del descubrimiento de prueba de las partes demandadas y ellos pudieron haber sido presentados en el juicio como peritos de ocurrencia de los demandados de así estimarlo necesario. San Lorenzo Trad., Inc. v. Hernández, 114 D.P.R. a las págs. 713-719. Por lo tanto, resolvemos que el TPI no cometió error al admitir el testimonio del Dr. Lugo y tomarlo en consideración al momento de dictar la sentencia apelada.
Con relación al Dr. Martínez, también resolvemos que el TPI tampoco erró al admitir su testimonio pericial y tomarlo en consideración al momento de dictar sentencia. Primero, las Guías Para la Evaluación de Impedimento Permanente establecen que la persona que aplica o compara los criterios de las guías con los resultados de la evaluación del paciente no tiene que ser el mismo médico que evaluó al paciente. American Medical Association, Guides to the Evaluation of Permanent Impairment § 2.1. Por lo tanto, según las Guías Para la Evaluación de Impedimento Permanente, el hecho de que el Dr. Martínez no haya examinado personalmente a los demandantes no convierte su testimonio con relación a los tipos y grados de impedimentos físicos sufridos por los demandantes en uno no confiable.
Segundo, las Guías Para la Evaluación de Impedimento Permanente de la Asociación Médica Americana son una herramienta para ayudar a los médicos, jueces, agencias, seguros, etc. a hacer un estimado de manera objetiva de los impedimentos permanentes que una persona puede padecer y su gravedad. La misma no ofrece una contestación para cada tipo y grado de impedimento. La información contenida en las guías es sólo un factor a ser utilizado al momento de determinarse el tipo y grado de impedimento permanente que pueda padecer un paciente en determinado momento. AMERICAN MEDICAL ASSOCIATION, GUIDES TO THE EVALUATION OF Permanent Impairment § 1.3. Por lo tanto, dichas guías no pueden ser utilizadas o interpretadas de manera que vayan a reemplazar las Reglas de Evidencia. De haber una contradicción entre las Guías Para la Evaluación de Impedimento Permanente y las Reglas de Evidencia, siempre prevalecerán las segundas sobre las primeras.
En el presente caso, el Dr. Martínez determinó los por cientos de incapacidad de los demandantes a base de los expedientes del FSE, los expedientes preparados por el Dr. Lugo e información adicional ofrecida por el Dr. Lugo. El Dr. Martínez no examinó personalmente a los demandantes. Testimonio del Dr. Martínez, Vol. 25, págs. 82-83 y 89-91. Como señalamos anteriormente, según la Regla 56 de Evidencia, un médico puede declarar sobre la condición de un paciente a base de lo que ha conocido por medio de los expedientes médicos del paciente e información recibida de otros médicos o enfermeras. Historial de la Regla 56 de Evidencia, supra. Por lo tanto, el testimonio del Dr. Martínez es admisible. El error alegado por los apelantes-demandados no fue cometido.
E- Suficiencia de la Prueba
Los apelantes-demandados alegan que el TPI erró al concluir que la única causa de los daños sufridos por los demandantes fue la presencia de hongos en el edificio ocupado por ADT. Los apelantes-demandantes basan su alegación en que según los expedientes del FSE, los demandantes eran sensitivos a diferentes alérgenos, entre los cuales se encontraron ácaros, hongos, murcielaguina, humo de cigarrillo, grama y polvo. Es decir, las pruebas de alergia efectuadas por el FSE no pudieron establecer con exactitud que los hongos encontrados en las Oficinas de ADT fue lo que causó los daños a los demandantes. Más aún, cuando muchos de los demandantes no salieron sensitivos a los hongos y sí a otros alérgenos. Razón por la cual, el FSE determinó como relación causal de los daños de los demandantes su área de trabajo y no un alérgeno en específico. Por lo tanto, los demandantes no pudieron probar en juicio mediante preponderancia de prueba que la alegada negligencia de los demandados fue la causa de los daños sufridos por los demandantes. Resolvemos que el error alegado por los apelantes-demandados no fue cometido.
La Regla 10(F) de Evidencia (32 L.P.R.A. Ap. IV, R. 10(F)) establece lo siguiente:

*1021
“El tribunal o juzgador de hechos deberá evaluar la evidencia presentada, a los fines de determinar cuáles hechos han quedado establecidos o demostrados, con sujeción a los siguientes principios:

(A)...

(B)...

(Q...

(D)...

(E)...

(F) En los casos civiles, la decisión del juzgador deberá producirse dé acuerdó con lá preponderancia de las pruebas a base de criterios de probabilidad; eñ los casos criminales, la culpabilidad del acusado debe establecerse más allá de duda razonable. ”

Dicha regla establece que “fija preponderancia de prueba es el estándar que rige, de ordinario, la suficiencia de la prueba en casos civilesII ERNESTO L CHIESA, TRATADO DE DERECHO PROBATORIO 1233 (1999). A su vez, preponderancia de la prúeba significa qüe a base de lá totalidad de lá prueba presentada en el juicio, üü hecho fue más probable que haya ocürrido que otro. Esto significa que en los casos de daños y perjuicios, para que dicha acción prospere, el demandante debe probar en juicio que el daño sufrido se debió con mayores probabilidades a la negligencia imputada al demandado que a otras posibles causa. No puede exigírsele al demandante que elimine todá otra posible causa del daño para que su demanda pór daños y perjuicios pueda prosperar. Rodríguez v. Ponce Cement Corp., 98 D.P.R. 201, 208 (1969); y Sáez v. Municipio de Ponce, 84 D.P.R. 535, 543-544 (1962).
El estándar de preponderancia fue explicado por el Tribunal Supremo en la opinión de Berrios v. U.P.R., 116 D.P.R. 88, 100-101 (1985), de la siguiente manera:

“Reiteramos que ‘[e]n muy raras ocasiones es posible determinar un hecho con certeza o exactitud matemática. Exigir ese tipo de prueba a un litigante equivaldría prácticamente a requerirle lo imposible. Por ello, la ley y la jurisprudencia se limitan a requerir que los casos se prueben por preponderancia de prueba, que es tanto como establecer como hechos probados aquéllos que con mayÓYes probabilidades ocurrieron... No es necesario probar un hecho con exactitud matemática... El demandante de una acción civil no está obligado a probar un caso más allá de duda razonable. Tampoco se le exige, en casos de responsabilidad por culpa o negligencia, excluir toda otra posible causa de daños’. ’’

En la presente sentencia, ya hemos resuelto que durante el juicio se probó de forma clara que las Oficinas de ADT en el Edificio Isaacar en Humacao sufrió del síndrome de edificio enfermo desde finales de 1988 hasta la primera mitad del 1990. También resolvimos que durante el juicio se probó que Isaacar fue responsable de los daños causados a los demandantes por motivo del síndrome de edificio enfermo que ocurrió en las Oficinas de ADT en el Edificio Isaacar en Humacao.
El hecho de que durante el juicio no se pudo probar de manera específica que los hongos que se encontraban en las Oficinas de ADT causaron los daños reclamados por los demandantes, no significa que la acción deba ser desestimada. No era necesario que los demandantes tuvieran que probar de manera exacta o más allá de duda razonable que sus daños se debieron a los hongos existentes en las Oficinas de ADT. Más todavía, cuando generalmente se utiliza el término de síndrome de edificio enfermo para describir situaciones en que más del veinte por ciento (20%) de los ocupantes de un edificio sufren de molestias o síntomas agudos en su *1022 salud que están relacionadas al tiempo en que se encuentran en un edificio, pero en el cual no se ha podido identificar una enfermedad o causa específica que cause tales molestias o síntomas agudos en la salud; y los .síntomas relacionados al síndrome de edificio enfermo no concuerdan con un síndrome clínico específico y típicamente no están asociados a una fuente en específico o a un contaminante específico del aire. Michael T. Pyle, Enviromental Law in an Office Building: The Sick Building Syndrome, 9 Journal of Envtl. Law and Litigation p. 176; y Harold L. Hirsh, Indoor Air Pollution, The Sick Building Syndrome (SBS) and Building Related Illness (BRI), 43(1) Medical Trial Technique Quarterly, pp. 25-26.
Sólo bastaba que los demandantes probaran que sus daños se debieron lo más probable a la condición de edificio enfermo que sufrió las Oficinas de ADT. Resolvemos que a base de la totalidad de la prueba presentada por los demandantes en el juicio (los testimonios de los demandantes, los expedientes del FSE y la prueba pericial presentada durante el juicio), los demandantes cumplieron con el estándar de preponderancia de prueba, por lo que probaron que los daños que ellos sufrieron se debió al síndrome de edificio enfermo que ocurrió en las Oficinas de ADT en el Edificio Isaacar en Humacao. El error alegado por los apelantes-demandados no fue cometido.
F- Temeridad de los Demandados
Los apelantes-demandados alegan que el TPI erró al condenarlos a pagar intereses pre-sentencia y honorarios de abogados. El error alegado fue cometido por el TPI.
El inciso (d) de la Regla 44.1 de Procedimiento Civil (32 L.P.R.A. Ap. III, R. 44.1(d)) establece lo siguiente:

“En caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogados que el tribunal entienda correspondan a tal conducta. ”

Mientras que en el inciso (b) de la Regla 44.3 de Procedimiento Civil (32 L.P.R.A. Ap. III, R. 44.3(b)) establece lo siguiente:

“El tribunal también impondrá a la parte que haya procedido con temeridad el pago de interés al tipo que haya fijado la Junta en virtud del inciso (a) de esta regla y que esté en vigor al momento de dictarse la sentencia desde que haya surgido la causa de acción en todo caso de cobro de dinero y desde la radicación de la demanda, en caso de daños y perjuicios, y hasta la fecha en que se dicte sentencia a computarse sobre la cuantía de la sentencia, excepto cuando la parte demandada sea el Estado Libre Asociado de Puerto Rico, sus municipios, agencias, instrumentalidades o funcionarios en su carácter oficial. El tipo de interés se hará constar en la sentencia. ”

De la lectura de las disposiciones legales citadas se podrá apreciar que ambas medidas son maneras de castigar a una parte que haya actuado de forma temeraria durante la tramitación de un caso civil. Una establece el castigo mediante la condena del pago de una suma determinada de dinero y la otra establece el castigo mediante la condena del pago de intereses sobre una suma de dinero establecida en una sentencia. Pero en esencia, ambas medidas constituyen un castigo por la parte haber actuado de manera temeraria. Montañez López v. Universidad de Puerto Rico, 2002 J.T.S. 40, pág. 858; e Insurance Co. of Puerto Rico v. Tribunal Superior, 100 D.P.R. 405, 411 (1972).
Se entiende que una parte ha sido temeraria cuando ésta ha obligado a la otra u otras partes a incurrir en gastos innecesarios al interponer pleitos frívolos, o alargar innecesariamente aquellos ya presentados ante la consideración de los tribunales, o que provoque que incurra o incurran en gestiones evitables. Domínguez *1023 Vargas v. Great American Life Assurance Company of Puerto Rico, Inc., 2002 J.T.S. 110, pág. 21; Rivera v. Tiendas Pitusa, Inc., 148 D.P.R. 695, 702 (1999); Blas v. Hosp. Guadalupe, 146 D.P.R. 267, 335 (1998); Oliveras, Inc. v. Universal Ins. Co., 141 D.P.R. 900, 935 (1996). El estándar de revisión de una imposición de honorarios de abogados o la condena del pago de intereses pre-sentencia es el de abuso de discreción. Jarra Corporation v. Axxis Corporation, 2001 J.T.S. 167, pág. 491.
El propósito de la imposición de honorarios por temeridad es establecer una penalidad a un litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconvenientes de un pleito. Domínguez Vargas v. Great American Life Assurance Company of Puerto Rico, Inc., 2002 J.T.S. 110, a la pág. 22; Rivera v. Tiendas Pitusa, Inc., 148 D.P.R. a la pág. 702; Blas v. Hosp. Guadalupe, 146 D.P.R. a la pág. 335; Oliveras, Inc. v. Universal Ins. Co., 141 D.P.R. a la pág. 936; y Santos Bermúdez v. Texaco P. R., Inc., 123 D.P.R. 351, 356 (1989).
Sin embargo, el Tribunal Supremo ha resuelto constantemente que una parte no actúa con temeridad cuando litiga planteamientos complejos y novedosos no resueltos en nuestra jurisdicción. Soc. de Gananciales v. Royal Bank de P.R., 145 D.P.R. 178, 209-210 (1998); Oliveras, Inc. v. Universal Ins. Co., 141 D.P.R. a la pág. 936; y Santos Bermúdez v. Texaco P. R., Inc., 123 D.P.R. a la pág. 356.
En el presente caso, el TPI condenó a los demandados a pagar la suma de $35,000.00 en concepto de honorarios de abogados y a pagar los intereses sobre la totalidad de los daños concedidos a los demandantes desde la fecha de presentación de la demanda de daños y perjuicios. Aunque el TPI no expresó en su sentencia que los demandantes fueron temerarios, la imposición de honorarios de abogados y del pago de intereses pre-sentencia sobre la totalidad de la indemnización concedida constituyó una determinación implícita de temeridad por parte del TPI. Rivera v. Tiendas Pitusa, Inc., 148 D.P.R. a la pág. 702; e Insurance Co. Of Puerto Rico v. Tribunal Superior, 100 D.P.R. a la pág. 409.
Erró el TPI al condenar a los demandados a pagar honorarios de abogados e intereses pre-sentencia, debido a que el presente caso de daños y perjuicios por motivo del síndrome de edificio enfermo es complejo y novel. El presente caso es novel tanto a nivel del Tribunal Supremo como a nivel del Tribunal de Apelaciones. Por lo que se revocan las sanciones del pago de honorarios de abogado e intereses pre-sentencia impuestas a los demandados.
G- Las Causas de Acción de las Demandantes Ana G. Meléndez Rodríguez y Doris Vega López
Los demandados-apelados del Escrito de Apelación, KLAN-01-00828, alegan que el TPI erró al permitir que las demandantes Ana G. Meléndez Rodríguez y Doris Vega López presentaran prueba durante el juicio y adjudicarles $16,000.00 y $40,000.00 en daños respectivamente, cuando el TPI había dictado una Sentencia Parcial el 26 de mayo de 1998 autorizando el desistimiento solicitado por ambas demandantes. Resolvemos que el error no fue cometido.
Aunque el 26 de mayo de 1998 el TPI dictó una Sentencia Parcial concediendo el desistimiento de ambas demandadas, en la misma, el TPI no expresó si el desistimiento era con perjuicio o sin perjuicio. Ver anejo B de la Réplica de la Parte Demandada-Apelante Al Alegato de la Parte Demandante-Apelada. Por lo tanto, a tenor con el inciso (b) de la Regla 39.1 de Procedimiento Civil (32 L.P.R.A. Ap. III, R. 39.1), el desistimiento ordenado por el TPI fue sin perjuicio y ambas demandantes podían volver a reclamar los daños y perjuicios sufridos por el síndrome de edificio enfermo a los demandados. De la Matta v. Carreras, 92 D.P.R. 85, 94 (1965); y Rafael Hernandez ColOn, Derecho Procesal Civil § 3904 (1997).
En relación con su reinstalación como demandantes en el caso, la Regla 21.2 de Procedimiento Civil (32 L. *1024 P.R.A. Ap. III, R. 21.2), autoriza a un tribunal a permitir la intervención de demandantes en un caso cuando la reclamación del demandante y el pleito principal tuvieran una cuestión de hecho o de derecho en común. Rafael Hernandez Colon, Derecho Procesal Civil § 1304 (1997). Como las reclamaciones de las demandantes Ana G. Meléndez Rodríguez y Doris Vega López y el presente caso eran sobre los mismos hechos y derecho, una acción de daños y perjuicios por síndrome de edificio enfermo ocurrido en las Oficinas de ADT en el Edificio Isaacar en Humacao, y el presente caso no se afectó indebidamente por la intervención de las demandantes, resolvemos que el TPI no abusó de su discreción ni erró al autorizar la reinstalación de dichas demandantes en el presente caso. Nuestra decisión también se fundamenta en el hecho de que los demandados tuvieron la oportunidad de interrogar a ambas demandantes y a los peritos que opinaron con relación a los daños alegados por ellas durante el juicio. Por lo tanto, los apelantes-demandados no tienen motivos para quejarse en esta etapa de los procedimientos. Nicole v. Montalvo, 66 D.P.R. 341, 344-345 (1946).
H- La Evaluación de los Daños de los Demandantes
Por último, los apelantes-demandados alegan que el TPI erró al evaluar los daños de los demandantes. Resolvemos que el error no fue cometido.
“La responsabilidad civil en daños y perjuicios es resarcir al damnificado, otorgándole un valor económico al daño sufrido. Consiste en atribuir al perjudicado dinero suficiente para compensar su interés perjudicado. Es una especie de subrogación en los daños y perjuicios sufridos, y una atribución pecuniaria que crea una situación patrimonial equivalente a la destruida por el daño causado.” Rivera v. Tiendas Pitusa, Inc., 148 D.P.R. 695, 700 (1999); y S.L.G. v. F.W. Woolworth & Co., 143 D.P.R. 76, 81 (1997).
De entrada, queremos dejar claro que estamos de acuerdo con el TPI a los efectos de que en las Oficinas de ADT en el Edificio Isaacar en Humacao ocurrió el síndrome de edificio enfermo. Además estamos claros de que los sesenta y siete (67) demandantes que fueron empleados públicos que trabajaron o tomaron adiestramientos en dichas oficinas sufrieron daños a causa del síndrome de edificio enfermo, por lo que ellos tienen derecho a ser indemnizados.
Sin embargo, hay que tener en cuenta que la gestión judicial de estimar y valorar los daños es difícil y angustiosa, debido a que no existe un sistema de certera computación que permita llegar a un resultado exacto en relación con lo cual todas las partes queden satisfechas y complacidas. Rodríguez Báez v. Nationwide Insurance Company, 2002 J.T.S. 61, pág. 1010; Hernández Nieves v. Universidad de Puerto Rico, 2001 J.T.S. 91, pág. 1211; y Blas v. Hosp. Guadalupe, 146 D.P.R. a la pág. 339. Como el Tribunal de Primera Instancia es quien ha estado en contacto directo con la prueba, en especial la prueba testifical, el Tribunal Supremo ha establecido la norma de que los tribunales apelativos deben abstenerse de intervenir respecto a las cantidades concedidas, a menos que éstas sean ridiculamente bajas o exageradamente altas. Rodríguez Báez v. Nationwide Insurance Company, 2002 J.T.S. 61, a la pág. 1010; Blas v. Hosp. Guadalupe, 146 D.P.R. a lá pág. 339; y Toro Aponte v. E.L.A., 142 D.P.R. 464, 478 (1997). Además, la mencionada norma está fundada en criterios de estabilidad y respeto a los tribunales de primera instancia. Por ende, la cuantificación necesaria y justa para compensar los daños queda en el sano juicio, la experiencia y discreción del juzgador. Rodríguez Báez v. Nationwide Insurance Company, 2002 J.T.S. 61, a la pág. 1010.
Luego de evaluar las cantidades concedidas por el TPI a los sesenta y siete (67) demandantes que eran empleados de la ADT y del DSS, concluimos que las mismas no son exageradamente altas ni ridiculamente bajas. Por lo tanto, resolvemos confirmarlas.
SENTENCIA
Por los fundamentos que anteceden, se desestima la demanda con relación al co-demandado Tremendo *1025 Cash & Carry, Inc. y se revoca la condena del pago de honorarios de abogado e intereses presentencia a los apelantes-demandados. Así modificada, se confirma la sentencia apelada.
Notifíquese inmediatamente.
Lo acordó y ordena el Tribunal y lo certifica la Secretaria General.
Aída Heana Oquendo Graulau
Secretaria General